Argued and submitted November 23, 1999, vacated and remanded in part;
otherwise affirmed August 30, 2000

Wendy PANGLE
and Kevin Pangle,
as guardians ad litem for Chris Pangle,
a minor child,
*Appellants,*

*v.*

BEND-LAPINE SCHOOL DISTRICT,
Ed Tillinghast, Scott Mutchie,
David Holmberg and Allan Frickey,
*Respondents.*

(97-CV-0316-AB; CA A100163 (Control))

Wendy PANGLE
and Kevin Pangle,
as guardians ad litem for Chris Pangle,
a minor child,
*Appellants,*

*v.*

BEND-LAPINE SCHOOL DISTRICT,
*Respondent.*

(97-CV-0413-AB; CA A100173)
(Cases Consolidated)

10 P3d 275

Jonathan M. Hoffman argued the cause for appellants. With him on the briefs was Martin, Bischoff, Templeton, Langslet & Hoffman, LLP.

Thomas S. Moore argued the cause for respondents. With him on the briefs were Stefan W. Farr, and Thomas S. Moore, P. C.

Kim Jefferies, and Wood Tatum Sanders & Murphy, Portland, filed a brief *amicus curiae* for American Civil Liberties Union.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.

EDMONDS, P. J.

Armstrong, J., concurring in part and dissenting in part.

## EDMONDS, P. J.

This case involves the expulsion of a high school student for writing articles included in a publication that he distributed to fellow students on his high school campus. Plaintiffs[1] initiated two actions that were consolidated for trial. After trial, the trial court dismissed all of plaintiffs' claims with prejudice, and plaintiffs appeal. In one action, plaintiffs seek a writ of review, ORS 34.010 through ORS 34.102, on the ground that the Bend-LaPine School District's (the district) actions violated Chris's rights under Article I, section 8, of the Oregon Constitution, and the First and Fourteenth Amendments to the United States Constitution.[2] In the other, they request declaratory and injunctive relief under ORS 28.010 through ORS 28.160, on the ground that defendants' actions violated Chris's rights under Article I, section 8, of the Oregon Constitution, and relief under 42 USC section 1983 for violations of Chris's First and Fourteenth Amendment Rights.[3] On appeal, plaintiffs argue that the publication was protected expression, and they request as relief that the decision to discipline Chris be expunged from his school records.[4] We remand for entry of a judgment that dismisses the state law claims for lack of jurisdiction and otherwise affirm.

During the 1996-97 school year, Chris was a junior at Mountain View High School in the Bend-LaPine School

---

[1] Plaintiffs are Kevin and Wendy Pangle, the parents and guardians *ad litem* of the student, Chris Pangle (Chris).

[2] For purposes of this opinion, we refer to this action as the writ of review action.

[3] For purposes of this opinion, we refer to this action as the declaratory judgment action. The defendants named in the declaratory judgment action are the Bend-LaPine School District; Scott Mutchie, Superintendent of the District; Allan Frickey, Assistant Superintendent; Ed Tillinghast, Principal of Mountain View High School; and David Holmberg, Assistant Principal.

[4] There is no contention that Chris is currently a student at the high school. Plaintiffs seek expungement "pending a new hearing limited to constitutional bases for punishment." In the alternative, plaintiffs ask for a declaration of Chris's rights under Article I, section 8, of the Oregon Constitution, and the First and Fourteenth Amendments and "remand for relief consistent with such a ruling." Because of his nonstudent status, the only remaining justiciable controversy is whether the district could have constitutionally disciplined Chris for his expression. *Barcik v. Kubiaczyk*, 321 Or 174, 895 P2d 765 (1995).

District. He and other individuals wrote articles included in a publication entitled *OUTSIDE!* Chris distributed copies of the publication to other students at the high school. The publication was distributed on school grounds without the authorization of school authorities. One article written by Chris included a list of acts that he "would like to see happen at school... to the people who 'run' it." The list described, in part, "[f]eed[ing] snake bite antidote or Visine to someone[,]" as well as "[b]lowing things up" and "bomb threats." Another article included a list of the names, addresses and telephone numbers of the teachers of the high school.

After Chris distributed *OUTSIDE!* in late April 1997, Holmberg conducted an investigation, and a disciplinary hearing was scheduled. Chris was suspended from attending school pending the hearing.[5] A hearings officer conducted a factfinding hearing on May 6, 1997. He found that Chris admitted to writing parts of *OUTSIDE!*, to helping put *OUTSIDE!* together, and "to the distribution of copies of * * * OUTSIDE!* at school." He also recommended that Chris be expelled from the high school through the first semester of the 1997-98 school year. He also proposed that Chris be allowed to reenter the high school at the beginning of the 1997-98 school year if a plan of administrative probation could be developed that was acceptable to plaintiffs and the school administration. Thereafter, Frickey sent plaintiffs and Chris a letter dated May 12, 1997, that provided, in part:

> "Based on the findings and recommended discipline from Christopher's hearing of May 6, 1997, he is hereby expelled through the first semester of the 1997-98 school year. * * *
>
> "* * * * *
>
> "The administration at Mountain View High School further offers that Christopher be allowed to re-enroll at

---

[5] Plaintiff's exhibit 24 is a notice informing the Pangles that Chris was suspended pending a disciplinary hearing "because [he] disrupted school at MVHS by distributing an unauthorized publication of a profane and threatening nature." Plaintiffs' exhibit 23, the notification for the disciplinary hearing, makes the identical allegation.

Mountain View, on probation, at the beginning of the 1997-98 school year (September 2, 1997). The Plan of Administrative Probation shall be developed by the Mountain View High administration and would need to be agreed to by Christopher and a parent to re-enter school prior to February[ ] 1998."

On July 2, 1997, plaintiffs filed the declaratory judgment action. On August 18, 1997, plaintiffs filed the writ of review petition. Plaintiffs filed their amended petition for a writ of review on August 25, 1997. The record also reveals that the initial plan of administrative probation was developed by August 21, 1997, and, apparently, Chris reentered school in the fall of 1997 pursuant to it. The matters went to trial in September 1997.

After trial, the court entered a judgment dismissing the claims in both actions. In its memorandum opinion, the trial court granted defendants' ORCP 21 motion to dismiss plaintiffs' amended petition for a writ of review because the petition was untimely. Also, the trial court ruled that

> *"OUTSIDE!* is intended to materially and substantially interfere with the school's operation. It is not simply an expression of an unpleasant criticism or unpopular viewpoint. A school is well within constitutional parameters to prohibit publications like *OUTSIDE!* which actively promote chaos and disruption within the school, and to impose discipline for the circulation of such material. Defendants did not violate [Chris's] constitutional rights by expelling him from school."

## I. THE WRIT OF REVIEW ACTION

We begin by addressing the issues concerning the writ of review action. Before we discuss plaintiffs' assignment of error, we note that "[t]he writ of review process is *sui generis.*" *Shipp v. Multnomah County*, 133 Or App 583, 589, 891 P2d 1345, *rev den* 321 Or 246 (1995). "It is a creature of statute, and the trial court has authority to act only when the statutory requirements have been met." *Shevchynski v. City of Eugene*, 157 Or App 355, 360, 970 P2d 237 (1998). In *Shevchynski*, we held that, "before a court may review a proceeding pursuant to a writ of review, the court *must first* issue the writ. Otherwise, there simply is no action before the

court to be reviewed." 157 Or App at 361 (emphasis in original). *See* ORS 34.060 (providing, in part, that "[t]he writ shall be directed to the court, officer, or tribunal whose decision or determination is sought to be reviewed"); *see also* ORS 34.080 (providing, in part, that "[u]pon the filing of the order allowing the writ, and the petition and undertaking of the plaintiff, the clerk shall issue the writ, as ordered[,]" and that the writ shall be served to the opposite party). In *Shevchynski*, no writ was issued or served because the trial court failed to issue the order allowing the writ. Consequently, we vacated the trial court's judgment and remanded the case for the issuance of the writ depending on whether the trial court determined that the statutory prerequisites had been met.

■ Our review of the record in this case does not reveal that the trial court ordered the issuance of the writ or that the writ to the district issued or was served. Rather, plaintiffs served a civil summons on the district. However, there is no need to remand for the issuance of a writ if the trial court was correct when it ruled that the petition was not filed timely. Thus, we turn first to plaintiffs' third assignment of error in which they assert that "the trial court erred in dismissing the writ of review as untimely." *See* ORS 34.030 (providing, in part, that a writ of review will not be allowed unless the petition is filed "within 60 days from the date of the decision or determination sought to be reviewed"). Specifically, plaintiffs contend that the "[a]mended [p]etition for [r]eview was filed within 60 days of the issuance of the Plan of Administrative Probation which, in turn, was the final decision in the District's process in disciplining petitioner for the writing and distribution" of the publication. In other words, plaintiffs rely on the issuance of the plan of administrative probation in August as the date when the time period began for purposes of ORS 34.030. If, instead, the time period began on May 12, when the district sent the letter expelling Chris, plaintiffs' petition is untimely.

Plaintiffs rely on three cases to support their argument that the May 12 decision did not start the clock running under ORS 34.030: *Holmes v. Cole*, 51 Or 483, 94 P 964 (1908), *Duddles v. City Council of West Linn*, 21 Or App 310, 535 P2d 583 (1975), and *Lyford v. Bd. of Comm'rs for Benton County*, 59 Or App 585, 651 P2d 1355 (1982), *rev den* 294 Or

460 (1983). Based on the holdings of those cases, they argue that the decision to expel Chris was not "final" for purposes of ORS 34.030 until the plan for probation, which apparently permitted Chris to reenter school in the fall of 1997, was agreed upon. However, none of those cases is factually on point. Moreover, our review of the record reveals that the district did not change its decision to discipline Chris after May 12. The only change was in the length of the expulsion. The language of ORS 34.030 is clear: "A writ shall not be allowed unless the petition therefor is made within 60 days from the date of the *decision or determination sought to be reviewed.*" (Emphasis added.) Here, the decision sought to be reviewed is the decision to discipline Chris. In light of the relief sought by plaintiffs, the fact that Chris was later permitted to return to school before the original term of the expulsion expired is of no import. Consequently, we conclude that plaintiffs' petition for a writ of review was untimely because it was filed more than 60 days after May 12, and the trial court did not err in dismissing it on that basis.

## II. THE DECLARATORY JUDGMENT ACTION

### A. *The State Claims*

■■■■ We now turn to the issues concerning plaintiffs' claim for a declaratory judgment under ORS chapter 28. Defendants cross-assign as error the trial court's failure to dismiss plaintiffs' Oregon constitutional claims in that action on the ground that the writ of review was their exclusive remedy. One of the writ of review governing statutes, ORS 34.040, provides:

> "(1) The writ shall be allowed in all cases in which a substantial interest of a plaintiff has been injured and an inferior court including an officer or tribunal other than an agency as defined in ORS 183.310(1) in the exercise of judicial or quasi-judicial functions appears to have:
>
> "(a) Exceeded its jurisdiction;
>
> "(b) Failed to follow the procedure applicable to the matter before it;
>
> "(c) Made a finding or order not supported by substantial evidence in the whole record;

"(d) Improperly construed the applicable law; or

"(e) Rendered a decision that is unconstitutional.

"(2) The fact that the right of appeal exists is no bar to the issuance of the writ."

We conclude that the expulsion hearing was quasi-judicial in nature as required by the statute. The hearing was held consistent with the Student Code of Conduct, which provides, in part, that "[t]he hearings officer will determine the facts of each case on the evidence presented at the hearing. He will submit his findings and his recommendation *for disciplinary action* to the Superintendent or his designee." (Emphasis added.) The hearings officer reviewed "exhibits" from both parties and heard from many individuals, including Holmberg, Chris, Chris's attorney, the school district's attorney, plaintiffs, students, teachers and community members. He made findings and opined that the expulsion was constitutionally and statutorily permitted based on those findings. As a result, he recommended that Chris be expelled. Subsequently, Assistant Superintendent Frickey adopted the hearings officer's findings and recommended discipline in the May 12 letter and expelled Chris.

■ ORS 34.020, the other governing statute, provides, in part:

"Except for a proceeding resulting in a land use decision or limited land use decision as defined in ORS 197.015, for which review is provided in ORS 197.830 to 197.845, or an expedited land division as described in ORS 197.360, for which review is provided in ORS 197.375(8), *any party to any process or proceeding before or by any inferior court, officer, or tribunal may have the decision or determination thereof reviewed for errors, as provided in ORS 34.010 to 34.100, and not otherwise.* Upon a review, the court may review any intermediate order involving the merits and necessarily affecting the decision or determination sought to be reviewed." (Emphasis added.)

Under ORS 34.020, the method for obtaining review of a quasi-judicial decision is by writ of review, "and not otherwise." Moreover, this case is not one in which review under ORS 34.010 to ORS 34.102 was unavailable had it been timely filed, or a case in which another specific statutory

or a common-law remedy exists for which there is jurisdiction over the cause. *See Shockey v. City of Portland*, 313 Or 414, 837 P2d 505 (1992), *cert den* 507 US 1017 (1993) (holding that the trial court had subject matter jurisdiction over a common-law wrongful discharge claim); *see also Ettner v. City of Medford*, 155 Or App 435, 963 P2d 149, *rev den* 328 Or 40 (1998) (holding that, regarding claims for employment discrimination under ORS chapter 659, the exclusivity provision of ORS 34.102(2) was inapplicable). Here, plaintiffs seek substantially the same relief under both their writ of review and declaratory judgment actions. To permit plaintiffs to obtain relief on their state law claims in their declaratory judgment action in this case would result in a *de novo* review of the hearings officer's decision in contravention of the exclusivity provision of ORS 34.020 and the time requirement in ORS 34.030. For these reasons, we reverse and remand with instructions to dismiss those portions of plaintiffs' claim for declaratory judgment based on state law for lack of jurisdiction of the cause. *See Shipp*, 133 Or App at 591.

B. *The 42 USC Section 1983 Claim*

■ In light of our conclusion that a writ of review is plaintiffs' exclusive remedy as to the state law claims, we must decide whether plaintiffs can pursue a remedy under 42 USC section 1983 for the alleged violation of Chris's First Amendment rights. A similar issue was addressed in *Barcik*, 321 Or at 182-86. In *Barcik*, the Oregon Supreme Court held that, "an Oregon court cannot apply state standards of mootness and justiciability to a section 1983 claim brought in state court if application of those standards would preclude a plaintiff's federal claim, but application of federal standards would not." *Id.* at 185. Relying on its own prior case law and United States Supreme Court case law, the court reasoned that

> "if state standards of mootness and justiciability are applied to plaintiffs' section 1983 claims raised in state court, plaintiffs will be prevented from securing injunctive relief and their 'uniquely federal remedy' in state court. Application of state standards of mootness and justiciability also would limit the rights that a plaintiff has in a federal claim, simply because that claim is brought in state court." *Id.*

If we applied our conclusion in this case that the writ of review was plaintiffs' exclusive remedy to plaintiffs' section 1983 claim, that claim would be precluded merely because it had been brought in state court..Because such a result would run contrary to the court's reasoning in *Barcik*, we conclude that the exclusivity of the writ of review remedy does not prevent us from reaching the merits of plaintiffs' section 1983 claim, and we turn to the merits of that claim.

■ Plaintiffs assert that Chris's

"right to write, print and distribute *OUTSIDE!* is guaranteed under the First Amendment. By censoring and banning *OUTSIDE!* and by disciplining plaintiff for publishing it, defendants violated those rights and continue to do so by maintaining derogatory information in [Chris's] student file."

Specifically, plaintiffs contend that the district's discipline of Chris violated his First Amendment rights because: (1) the discipline of a high school student cannot be based on the use of vulgar language; (2) the discipline of a high school student cannot be based on the use of threatening language that is not directed toward inciting or producing and likely to cause imminent lawless action; and (3) the discipline of a high school student cannot be based on the failure to obtain prior approval under a school rule for the distribution of a publication on campus.[6]

■ Before we discuss whether the district's discipline of Chris violated his First Amendment rights, a description of *OUTSIDE!* is necessary. *OUTSIDE!* contains quotations and numerous articles.[7] Chris wrote several articles included in the publication.[8] Some articles are merely criticisms of:

---

[6] The First Amendment to the United States Constitution provides, in part, that "Congress shall make no law * * * abridging the freedom of speech[.]"

[7] A disclaimer inside the front cover of the publication states, in part:

"Well, now we need to get some legal crap out of the way. None of us are lawyers none of us know lawyers, but this should cover our asses pretty well:

"OUTSIDE! is not responsible for the actions of other people. The articles within this newsletter are meant to distribute information, and anyone applying the methods or using the information within this document, we are not responsible fo[r]."

[8] Apparently most of the authors wrote under pseudonyms. In the context of *OUTSIDE!*, Chris is "Stryfe" and "Chuck M. Hall."

(1) the school environment fostered by teachers and the school administration and (2) the school administration's handling of a student event. However, one article written by Chris is entitled "TOP TEN THINGS...," and it states, in part:[9]

> "These are the top ten things I would like to see happen at school... to the people who 'run' it, or just some things to cause them Stryfe.

> "What is wrong with school you may ask...? I can't imagine too many people don't have their own individual responses to this question, but perhaps you would like to hear mine? Schools are a breeding ground for hatred and segregation. Students are persecuted by their peers, judged by their appearances and treated differently because of them. Cliques dominate their surroundings, and torment those who don't fit in... The teachers preach nothing more than conforming to the 'norm' and obeying authority when we reach the 'REAL WORLD', slowly destroying each young mind which enters the public school system. Most within know they are in classes which will never benefit them and they will be lost when they leave this institution of imbeciles.

> "That is just my two cents on this subject, and justification for this article. These ten items are not meant to be used on the student population, and make the environment they must suffer through everyday worse. It is intended to be used against the 'forces that be' in our society..."

The top ten list says:

> "10) Create an underground newsletter that shows how ignorant and overpowering the administration is. (Oops.. that has now been done!)

> "9) A citizens arrest of the administrators which are unjust... Some good proof would be needed, of course. Apparently destroying the minds of America's youth isn't a good enough reason, but one can wish.

> "8) Feed snake bite antidote or Visine to someone. The former will make a person vomit. (Make sure it is a harmless

---

[9] The quotations from *OUTSIDE!* are exactly as they appear in the publication. We did not correct the spelling or the punctuation and have made no changes to style or format.

type... most are.) The Visine will send them to the bathroom almost instantly. It is one of the world's greatest laxatives...

"7) Deposit some very disgusting smelling liquid in the school commons. Some possible sources?
Dog training liquid: smells like concentrated piss
Cadaver scent: used for Search and Rescue, it is the smell of a dead human body. Call a chemical company (Need some company names? Just write us! We will get you some!) and tell them you are training a dog for search and rescue... it is a great smell...
Hydrogen Sulfide: what most stink bombs are composed of. The chemistry room has an abundance of this I am told...

"6) A collection of teacher's signatures. They are not hard to obtain... teachers are usually pretty free with them. Progress reports, hall passes, anywhere. If a substantial list of them were established, it would be great to post around school!

"5) Epoxy glue any lock you can come to, aside from lockers. It will cause a lot of Kaos among the teachers.

"4) Blowing things up is always a great form of release... as long as people aren't endangered, life is good! How about toilets? Put calcium Carbide (sold as 'Gopher-Go' in some places) in a gelatin capsule (available at any drug store... dir cheap) and flush it. It causes a violent explosion when it hits water and some damage if it is flushed. Some other forms of exciting flushables? Firecrackers, balloons partly filled with air... be creative! Express yourself!

"3) Bomb threats are great, aren't they? We get to leave early, and if it is after 2:00 we don't have to make the day up at the end of the year. Anyway, if you attempt to call in a bomb threat, be careful. I am told it is a federal offense... not to scare anyone off. It would be great to have some more! However, don't be an IDIOT and tell everyone what it is you have done. Don't do it for the recognition, do it because you believe in the cause.

"2) How do you like the schools use of theh intercom system? Would you like to adapt it to your own private intercom show? That would be nice! And definitely possible! Splicing communication wires isn't hard at all! All you need is alligator clips, wire, a stereo with a pre-recorded tape and a remote location to splice in at. Above the panels of the ceiling, you can find the wire to the PA system.

"1) PORN ADDS! We have all the phone numbers and addresses of the teachers in the Bend/LaPine school district at our disposal! Using them, it would be nice to place them in a wonderful homosexual personal add! ...or even replying to one wit their name and number! If you would like any teachers number or address, please write us and we will get it to you!

(Special thanks to the Youth International Pary (The Yippies) for giving me the inspiration for this top ten list...)[10]

Well, there you have it. Enjoy, and I hope to see some of these employed in the nea future."

Additionally, the publication contains a list of the teachers' names, addresses and telephone numbers. Preceding the list, Chris writes:

"Now, do you really think it is fair that the teachers and staff have access to our phone numbers, our home addresses and our records? I don't. I think that is a load of shit. Here we have a list of every teacher, disciplinary bastard, cook and janitor at Mountain View High School. The idiots actually have a book with EVERY number to everyone who works for the district. No, not just our district, but Crook County as well. Did they really think that if it was only distributed to teachers that it would ensure privacy?

"Well, I hope you have fun with these. If you need any 'inspiration', just flip through this newsletter and I'm sure you will find some. However, be careful. Although teachers aren't noted for raking in a great income, they could still have Caller I.D. To avoid this? Just type in *67 before you call, and it will not be able to display your number..."

After the list of the teachers' names and addresses, the publication says:

"I do believe that all the numbers are here. In my haste of typing them up, I may have missed a few, so please let me know if there are any numbers which I have left out. The only number I know that I don't have is that hall monitor bastard who looks like a large penis. You know who I am talking about... I think the bastards name is "* * *"? Commonly known as dumb fuck. Well, if you do get his Name, Number and Address, I would REALLY appreciate it if you

---

[10] Apparently the ideas expressed in the list were retrieved from the Internet.

would sent it to us! ...actually, I think his son attends MVHS, so it may not be too hard to obtain afer all..."

Finally, an article in *OUTSIDE!* entitled "We Want Your Letters!!" states, in part:

"All the letters will be read and responded to by me, Chuck M. Hall, unless you ask for one of our other authors to reply to it.

"* * * * *

"We are strong believers in the belief that knowledge should be free to anyone who wants it! Going with that theory, if you e-mail us and request any of the information that we have within our magazine, it will be yours as fast as I can reply to it... Now, to contradict myself, we do need a certain amount of money to operate this newsletter. We aren't even considering charging for this wonderful pamphlet of papers, but we will lease out our services. Would you like a home made virus to distribute to other people's computers? We can do it! Just tell us what you want it to do, or say, and we will get it to you (With a small fee...). This is the only way we could think of to generate funds. If you can think of any others, please let us know. We are now a lil' hesitant to do this... An absolutely gorgeous friend of Stryfe and Krimson recieved a virus in an e-mail the other day and messed up her comp. If we do decide to distribute virii, please be responsible in the targets you choose..."

In order to determine whether the district's discipline of Chris was permissible under the First Amendment, we turn to the United States Supreme Court's case law concerning the First Amendment rights of high school students: *Tinker v. Des Moines School Dist.*, 393 US 503, 89 S Ct 733, 21 L Ed 2d 731 (1969), *Bethel School Dist. No. 403 v. Fraser*, 478 US 675, 106 S Ct 3159, 92 L Ed 2d 549 (1986), and *Hazelwood School District v. Kuhlmeier*, 484 US 260, 108 S Ct 562, 98 L Ed 2d 592 (1988). All of those cases have a common thread: First Amendment rights of expression must comport with the ability of schools to carry out their educational mission. In *Kuhlmeier*, the Court summarized the basic principles underlying the determination of whether a school district's discipline of a student violates the student's First Amendment rights:[11]

---

[11] In *Kuhlmeier*, the Court held that the petitioners did not violate the students' constitutional rights when they exercised editorial control over a high school

"Students in the public schools do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.' They cannot be punished merely for expressing their personal views on the school premises — whether 'in the cafeteria, or on the playing field, or on the campus during the authorized hours,'—unless the school authorities have reason to believe that such expression will 'substantially interfere with the work of the school or impinge upon the rights of other students.' * * *.

"We have nonetheless recognized that the First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings,' and must be 'applied in light of the special characteristics of the school environment.'[12] A school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school." *Kuhlmeier*, 484 US at 266 (citations omitted).

In *Tinker*, the Court held that the discipline of students for wearing black armbands to protest the Vietnam War—an action which caused no disruption—violated their First Amendment rights. In reaching that conclusion, the Court noted that the wearing of the armbands was akin to "pure speech" that "is entitled to comprehensive protection under the First Amendment." *Tinker*, 393 US at 505-06. However, the Court also said that it "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 507. Specifically, the Court held:

---

newspaper that was part of the school's curriculum. The district deleted two pages of the newspaper that, in addition to "unobjectionable" articles, contained two "objectionable" articles concerning three student's experiences with pregnancy and the impact of divorce on school students. The Court specifically held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." 484 US at 273.

[12] Because First Amendment rights are applied based on the special characteristics of a high school environment, cases that do not involve First Amendment rights in a high school setting do not aid our analysis.

"A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without 'materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others." *Id.* at 512-13 (citations omitted; bracketed material in original).

The Court then turned to the record before it and pointed out that there was no evidence of interference with the school's work or the rights of others because of the wearing of the armbands. The Court said that an "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression" and that school officials must demonstrate that their "action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 508-09. According to the Court, "the wearing of armbands in the circumstances of this case was entirely divorced from actually or potentially disruptive conduct by those participating in it." *Id.* at 505. Consequently, it concluded that the students' rights had been violated.

■ In *Fraser*, the Court held that disciplining a student for delivering a nominating speech at a school assembly that contained lewd and offensive language did not violate the student's constitutional rights. The Court began by noting the importance of considering the unique facts of each case:

"This Court acknowledged in *Tinker* * * * that students do not 'shed their constitutional rights to freedom of speech or expression at the school house gate.' The Court of Appeals read that case as precluding any discipline of Fraser for indecent speech and lewd conduct in the school assembly. That court appears to have proceeded on the theory that the use of lewd and obscene speech in order to make what the speaker considered to be a point in a nominating speech for a fellow student was essentially the same as the wearing of an armband in *Tinker* as a form of protest or the expression of a political position.

"The marked distinction between the political 'message' of the armbands in *Tinker* and the sexual content of respondent's speech in this case seems to have been given little

weight by the Court of Appeals. In upholding the students' right to engage in a nondisruptive, passive expression of a political viewpoint in *Tinker*, this Court was careful to note that the case did 'not concern speech or action that intrudes upon the work of the schools or the rights of other students.' " *Fraser*, 478 US at 680 (citations omitted).

While recognizing a student's freedom to express an unpopular and controversial viewpoint must be balanced against our society's interest "in teaching the boundaries of socially appropriate behavior," *id.* at 681, the Court stated that

> "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse. Indeed, the 'fundamental values necessary to the maintenance of a democratic political system' disfavor the use of terms of debate highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the 'work of the schools.' *Tinker*, 393 [US] at 508[.] * * *

> "The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order. Consciously or otherwise, teachers—and indeed the older students—demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment *in and out of class*. Inescapably, like parents, they are role models. The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as that indulged in by this confused boy." *Fraser*, 478 US at 683 (emphasis added).

Ultimately, the Court held that the

> "School District acted entirely within its permissible authority in imposing sanctions upon Fraser in response to his offensively lewd and indecent speech. Unlike the sanctions imposed on the students wearing armbands in *Tinker*, the penalties imposed in this case were unrelated to any political viewpoint. The First Amendment does not prevent the school officials from determining that *to permit a vulgar*

*and lewd speech* such as [the student's] *would undermine the school's basic educational mission." Id.* at 685 (emphasis added).

So far as we can discern, the United States Supreme Court has not ruled on any case involving facts that are analogous to this case. Although *Tinker*, *Fraser*, and *Kuhlmeier* are not factually on point, they instruct our analysis. First, as did the Court in each of its decisions, our analysis must engage with the unique set of factual circumstances present in this case. Also, we must decide the standard of review that applies to the trial court's ruling. We are mindful that *Barcik* suggests that we are to apply federal standards to section 1983 cases. When a federal district court upholds a restriction on speech as constitutional, the Ninth Circuit Court of Appeals conducts a *de novo* review unless the district court has made specific findings on disputed fact issues such as the credibility of witnesses. The latter are reviewed under a "clearly erroneous" standard. The reason often given for such a standard of review is that First Amendment cases often involve mixed questions of fact and constitutional law, and the Ninth Circuit chooses to particularly scrutinize those cases in which the district court has upheld a restriction on the freedom of expression. *See, e.g., Perry v. Los Angeles Police Dept.*, 121 F3d 1365 (9th Cir 1997), *cert den* 523 US 1047 (1998); *Lovell v. Poway Unified School Dist.*, 90 F3d 367 (9th Cir 1996). Here, we adhere to the Ninth Circuit's standard of review.

Second, we observe that the United States Supreme Court did not hold in *Tinker*, *Fraser* and *Kuhlmeier* that the "protected" or "unprotected" content of the expression was the determinative issue. Rather, the Court determined whether a school district could discipline for the expression in those cases based on the interests inherent in the school's educational mission. That was the case even in *Tinker* where the Court described the wearing of the armbands as akin to "pure speech." It is apparent, based on the lack of disruption caused by the armbands, that *Tinker* would have been decided differently had the protest been verbal and had it disrupted classroom instruction.

■■ Thus, the task confronting us in this case is to focus on the issue of any disruption, actual or potential, that the

dissemination of *OUTSIDE!* caused to school's educational mission. The importance of maintaining a structured and safe environment is underscored by the compulsory nature of public education in this state. *See* ORS 339.010 ("Except as provided in ORS 339.030, all children between the ages of 7 and 18 years who have not completed the 12th grade are required to attend regularly a public full-time school of the school district in which the child resides."). When children are within the school environment, parents must rely on school personnel to provide a safe and nondisruptive learning environment. As the court noted in *Fraser*, there is an "obvious concern on the part of parents, and school authorities acting *in loco parentis*, to protect children[.]" School personnel act in a surrogate parent role, insofar as student safety on high school campuses is concerned. *Fraser*, 478 US at 684. The exercise of appropriate discipline to deter disruptive forces within the school environment is as consistent with First Amendment rights as are constitutional limitations on free speech in other environments, such as constraints on yelling "Fire!" in a crowded movie theater.

That observation causes us to reject one of the implicit premises to plaintiffs' arguments. It does not necessarily follow that expression by a student in a school environment is protected to the same extent that the expression would be protected if made by an adult in a nonschool setting. *Kuhlmeier*, 484 US at 266; *Fraser*, 478 US at 682. As the Court has said, "[t]he undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior." *Fraser*, 478 US at 681. For that reason, it is untenable to argue that the use of vulgar or threatening language not resulting in actual disruption is not subject to discipline. As the Court indicated in *Tinker*, the question is whether the expression will motivate "actually or potentially disruptive conduct by those participating in it." 393 US at 505. Finally, "[a] school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school." *Kuhlmeier*, 484 US at 266 (citation omitted).

It is within this general framework that we proceed to examine the expression involved here. We have recited the

contents of the articles that Chris authored and that were disseminated at his instance to other students while they were on campus. In one of his articles, Chris writes about the "top ten things [he] would like to see happen at school... to the people who 'run' it." Those "things" include "feed[ing] snake bite antidote or Visine" to someone, "[d]eposit[ing] some very disgusting smelling liquid in the school commons" including "stink bombs,"[13] gluing school locks with epoxy, "[b]lowing things up" such as school toilets,[14] the making of bomb threats, the usurpation of the school intercom system,[15] and the taking out of advertisements of a pornographic nature using teachers' phone numbers and addresses. The article ends with the words, "Enjoy, and I hope to see some of these employed in the nea[r] future." Another article that accompanied the "top ten" list, stated the names, addresses and telephone numbers of faculty members and singles out a particular hall monitor whose child apparently was a student at the high school. Finally, the publication makes reference to the possibility in the future of using a computer virus to disrupt computers.

In those articles, Chris advocated specific methods for causing personal injury, property damage and the disruption of school activities. Furthermore, he described where to obtain the necessary materials to engage in some of the acts that he advocated. On these facts, we hold that the school district reasonably could have believed that *OUTSIDE!* would " 'substantially interfere with the work of the school or impinge upon the rights of other students[,]' " *Kuhlmeier*, 484 US at 266, quoting *Tinker*, 393 US at 509, and that its expulsion of Chris for writing the articles and for distributing the publication on school grounds therefore is consistent with the First Amendment.

Unlike in *Tinker*, the discipline in this case was not the result of an undifferentiated fear, particularly in light of

---

[13] The article informs the reader that the components for the bombs can be found in the chemistry room in the school.

[14] The article informs the reader how to accomplish the suggested activity and where to purchase the ingredients for the explosive materials. It also encourages the use of firecrackers on school premises.

[15] The article informs the student where the wires to the public address system are and what equipment is needed to carry out the invasion.

the trend of increasing school violence in this country and the specific actions urged by Chris. *See Lovell*, 90 F3d at 372 (noting "the backdrop of increasing violence among school children today"). The district's discipline of Chris does not constitute merely the suppression of an unpopular viewpoint. The advocacy of acts such as bomb threats, interfering with the public address system, poisoning and harassment of school personnel and explosions on school grounds is a form of expression that extends beyond mere protest.[16] Had the activities Chris advocated been effectuated, those activities certainly would have impinged on the safety and rights of other students and school personnel. Such speech is inconsistent with and undermines the basic function of a public school no less than the lewd, indecent or offensive speech expressed at the school assembly and held subject to discipline in *Fraser*.

 Having determined that the district could lawfully discipline Chris for his threatening speech, we turn to plaintiffs' first assignment of error and their argument that, based on the trial court's memorandum opinion, the discipline of Chris cannot remain on his record. In that opinion, the trial court appeared to hold that Chris's vulgar language in *OUT-SIDE!* was protected expression. It also ruled that Chris "stepped over the bounds of constitutional protection, however, when he advocated direct and disruptive action against the school [and] teachers[.]" Finally, the trial court ruled that "[a]lthough it is unnecessary to reach the issue of 'prior restraint,' Defendants may regulate the time, place, and manner of distribution of outside publications within the school. Exercise of this authority does not constitute an unconstitutional 'prior restraint.'" Thus, plaintiffs assert:

> "[T]he district did not segregate the charges against [Chris] and the punishment was a single penalty. Because the record does not negate the possibility that [Chris's] punishment was based on all three alleged violations, the District's punishment of [Chris] cannot stand."

---

[16] For example, an individual fed snake bite antidote or Visine could have a more serious reaction than vomiting or diarrhea. Furthermore, there is no way to guarantee that the use of firecrackers or the creation of explosions will harm only property. Also, we take note of the recent worldwide havoc caused by computer viruses.

In support of their argument, plaintiffs rely, in part, on *Mt. Healthy City School District Board of Ed. v. Doyle*, 429 US 274, 97 S Ct 568, 50 L Ed 2d 471 (1977). In that case, an untenured teacher was discharged, in part, for statements made to a local radio station that were protected under the First Amendment. The Supreme Court remanded for a determination by the lower court as to whether the teacher's employer would have reached the same decision on the alternative grounds for discharge in the absence of the protected expression. In reaching that decision, the Court surveyed cases in which it had formulated a test of causation that "distinguishe[d] between a result caused by a constitutional violation and one not so caused." *Id.* at 286. Ultimately, the Court held:

> "Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor'— or, to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of protected conduct.
>
> "We cannot tell from the District Court opinion and conclusions, nor from the opinion of the Court of Appeals affirming the judgment of the District Court, what conclusion those courts would have reached had they applied this test. The judgment of the Court of Appeals is therefore vacated, and the case remanded for further proceedings consistent with this opinion." *Id.* at 287.

Plaintiffs have not cited a case, and we are not aware of one, in which *Mt. Healthy* has been applied to a school district's decision to discipline a student for the dissemination of a publication that combines vulgar and threatening language. However, there is a more fundamental reason that *Mt. Healthy* does not apply to the circumstances of this case. In its memorandum opinion, the trial court stated, in part:

> "The discipline was based on the hearings officer's report which stated [that Chris] wrote and distributed an unauthorized publication, the contents of which were profane, threatening to staff and disruptive to the school.

"* * * * *

> "*OUTSIDE!* is intended to materially and substantially interfere with the school's operation. It is not simply an expression of an unpleasant criticism or unpopular viewpoint. A school is well within constitutional parameters to prohibit publications like *OUTSIDE!* which actively promote chaos and disruption within the school, and to impose discipline for the circulation of such material. Defendants did not violate Pangle's constitutional rights by expelling him from school."

In other words, the trial court appears to have found and, based on our independent review of the record, we agree that the district's only motive in disciplining Chris was to sanction him for the dissemination of his expression contained in *OUTSIDE!* Thus, this case is unlike *Mt. Healthy* because there was only one motive for the district's discipline as distinguished from the multiple motives in that case.

In their reply brief, plaintiffs compare this case to a hypothetical example that they argue compels the conclusion that Chris's discipline be expunged. Plaintiffs state:

> "Thus, if the District expelled a student upon findings that she: a) created a disruptive environment by being African-American in an all-white school; b) spoke to another student in the hall without submitting the content of the conversation to the principal for prior approval; and c) was caught running in the halls, the expulsion would evade constitutional challenge to the first two offenses altogether because the school could constitutionally expel her for the third one."

However, that example is inapposite because it reflects multiple motives: a motive based on race, a motive based on expression, and a motive based on pedagogical concerns. Here, the record reflects that the district had only one motive: to discipline Chris because he sought to disrupt the operation of the school by the dissemination of a publication that combined threatening language intended to cause disruption with other forms of expression. While it could be argued in the abstract that Chris's vulgar speech would not be disruptive to the school's educational mission, had it been published by itself, or that the school district could not discipline a student for protected speech under the school's rule prohibiting

dissemination without prior approval, those are not the circumstances under which the district imposed the discipline in this case.[17]

The parties' other arguments do not require discussion. Accordingly, we reject Chris's argument that his school record should be expunged on the ground that the district acted in violation of his constitutional right of freedom of expression when it disciplined him.

Judgment dismissing the state law declaratory judgment claim vacated for lack of jurisdiction and remanded for entry of judgment in accordance with this opinion; otherwise affirmed.

**ARMSTRONG, J.,** concurring in part and dissenting in part.

I join in the majority's resolution of all issues except plaintiffs' claim under 42 USC section 1983. I would hold that the district violated Chris's[1] rights under the First Amendment, as the United States Supreme Court has construed it, and that the trial court therefore erred in dismissing the section 1983 claim.

The district expelled Chris because he helped publish and distribute an underground newspaper.[2] Exactly what Chris did, and exactly why the district expelled him, are essential to determining the section 1983 claim. Two things are particularly important. First, the newspaper was entirely unofficial. Chris and the others involved in publishing it did so off-campus, on their own time, using nonschool equipment. The only on-campus activity was distributing the newspaper. Nothing about the newspaper even suggests that it was an

---

[17] We express no opinion as to whether *Mt. Healthy* would apply to a school district's decision to discipline a student under different circumstances.

[1] I will use the majority's short terms for describing those involved.

[2] As the majority notes, the Ninth Circuit generally reviews the facts *de novo* rather than under the normal federal "clearly erroneous" standard when the district court has upheld a restriction of speech as constitutional. 169 Or App at 394. I agree that we should follow that standard in this case, and I therefore state the facts based on my review of the record.

official school publication—if anything, it screams its unofficial nature—and no reasonable person could believe that it spoke for the school or the district.

The second significant point is that the reasons that the district asserted for expelling Chris are more limited than the possible reasons that the majority discusses. Chris received a hearing before the district expelled him. Allan Frickey, an assistant superintendent, reviewed the hearings officer's recommendation and made the final decision to expel Chris. In a deposition that was entered into evidence at trial, Frickey testified that he expelled Chris because he violated the law, specifically ORS 339.250(4)(a), which authorizes discipline of a student who uses or displays "profane or obscene language[.]" Frickey also stated that he was concerned about what he described as the material's threatening language, which he identified as threats of criminal action against employees and the school building. He did not act because the newspaper or its distribution was disruptive, but the fact that the distribution was unauthorized played a role. However, he also testified that the primary reason that the district prohibits distributing material without authorization is to prevent purely commercial fliers or other handouts; it would not prohibit, for instance, distributing *Time* magazine. Finally, Frickey testified that the directory containing teacher names and telephone numbers was not confidential and that there were no restrictions on distributing or copying it.

Among other things, those facts show that two of the three United States Supreme Court cases that the majority identifies as potentially relevant to this claim, *Hazelwood School District v. Kuhlmeier*, 484 US 260, 108 S Ct 562, 98 L Ed 2d 592 (1988); *Bethel School Dist. No. 403 v. Fraser*, 478 US 675, 106 S Ct 3159, 92 L Ed 2d 549 (1986), have little or nothing to do with it, leaving *Tinker v. Des Moines School Dist.*, 393 US 503, 89 S Ct 733, 21 L Ed 2d 731 (1969), as the controlling case. Both *Kuhlmeier* and *Fraser* involved a school district's ability to control what happened under the district's official sponsorship, an issue that is legally distinct from a district's ability to control what a student does acting entirely independently.

In *Fraser*, the student gave a speech containing sexual imagery at an official student assembly that the school required students to attend. In *Kuhlmeier* the school's principal deleted articles from an official school newspaper that students edited under the supervision of a teacher as part of a class for which they received credit. The Court emphasized those points in its decisions. *See Fraser*, 478 US at 681 (the court considered the First Amendment protection "accorded to Fraser's utterances and actions before an official high school assembly attended by 600 students"), 478 US at 685 (high school assembly or classroom is no place for sexually explicit monologue directed to unsuspecting students; it was appropriate for school to disassociate itself); *Kuhlmeier*, 484 US at 270-71 (question whether First Amendment requires school to tolerate particular student speech is different from whether it requires a school affirmatively to promote particular student speech; educators are entitled to greater control over second category than over first). Neither *Fraser* nor *Kuhlmeier*, thus, helps us in evaluating the constitutionality of the district's actions towards Chris. Cases that involve official or state-sponsored speech simply do not apply to a student's independent, unequivocally unofficial actions.

The controlling case, rather, is *Tinker*. In that case, the students were suspended for wearing black arm bands to school as part of a protest against the Vietnam War. They engaged in no disorder or disturbance of the school's activities; there were not even any group demonstrations. The district court held that the school's action was reasonable because of a fear of disturbance from the students' actions. The Supreme Court rejected that rationale, pointing out that

> "in our system, undifferentiated fear or apprehension of disturbances is not enough to overcome the right to freedom of expression. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society."

393 US at 508-09 (citation omitted).

The Court held that, in order for the school officials to justify prohibiting a particular expression of opinion, they had to show something more than a mere desire to avoid the discomfort and unpleasantness that accompany unpopular viewpoints. Rather, they had to show that the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school. In *Tinker* the district court did not make such a finding, and there was no evidence to support it. Rather, the school officials simply wanted to avoid the controversy over the Vietnam War. 393 US at 509-10. That, however, was not permissible.

> "In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school * * * are possessed of fundamental rights which the state must respect, just as they themselves must respect their obligations to the State. * * * [Students] may not be confined to the expression of those sentiments that are officially approved."

*Id.* at 511. Those principles are not limited to supervised discussion in the classroom; personal intercommunication among the students is both an inevitable part of attending school and an important part of the educational process. A student may express opinions at school, even on controversial subjects, so long as he or she does so without materially and substantially interfering with the requirements of appropriate discipline or colliding with the rights of others. *Id.* at 512-13.[3]

When I examine the district's stated reasons for expelling Chris in light of *Tinker*, I do not see how we can sustain its action. According to Frickey, he expelled Chris because of vulgar and threatening language in the newspaper. Even assuming that vulgar language by itself could somehow constitutionally be a basis for disciplining a high

---

[3] Those statements remain good law. Indeed, the primary if not only relevance of *Fraser* and *Kuhlmeier* to this case is that they reaffirm *Tinker's* basic holding in this regard. *See Kuhlmeier*, 484 US at 266; *Fraser* 478 US at 680.

school student, the vulgarity in the newspaper was no different from what is presently common in many other sources. As to the allegedly threatening language, Frickey did not claim that distributing the newspaper caused any disruption at the school, and he admitted that one thing that was apparently particularly disconcerting to teachers—listing home telephone numbers—did not violate any district policy or regulation. In addition, there is no evidence that Chris or anyone else engaged in, or planned or prepared to engage in, any of the suggested conduct that the majority quotes. The newspaper was not the equivalent of crying "fire" in a crowded theater.

Certainly some of the content of the newspaper, including portions of what Chris wrote, could be disconcerting to some readers, although the most disconcerting portions are apparently widely available on the Internet. Speech, however, is often disconcerting. People who believe strongly in what they say do not always speak in dulcet tones, and their voices sometimes grate on their hearers. That is the nature of the open society that the First Amendment protects; under *Tinker*, schools are part of that open society. Given the climate in the country in December 1965, when the students in *Tinker* wore their armbands, I suspect that their actions were at least as disconcerting as were Chris's actions in this case. The Supreme Court held, nevertheless, that the suspensions violated the students' rights under the First Amendment. I would hold, similarly, that the district violated Chris's rights and that he has a claim under section 1983. I dissent from the majority's contrary conclusion.