807 A.2d 847

**J.S., a Minor By and Through his parents and natural guardian H.S. and I.S., Appellants**

**v.**

**BETHLEHEM AREA SCHOOL DISTRICT, Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 15, 2001.

Decided Sept. 25, 2002.

640

642

Robert Einar Sletvold, Philip D. Lauer, Easton, for appellant, J.S., a minor.

Jason R. Wiley, Jeffrey T. Tucker, New Britain, for appellee, Bethlehem Area School Dist.

Jeffrey D. Litts, Stuart Lee Knade, New Cumberland, for appellee amicus curiae PA School Bd. Ass'n.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

Justice CAPPY.

This appeal presents our court with the difficult issue of whether a school district may, consistent with the First Amendment to the United States Constitution, discipline a student for creating at home, and posting on the Internet, a web site that, *inter alia*, contained derogatory, profane, offensive and threatening statements directed toward one of the student's teachers and his principal. We find that the school district did not violate the federal constitution by punishing the student for posting the web site in question. Thus, for the reasons stated below, we affirm the order of the Commonwealth Court.

In the spring of 1998, Appellant J.S. was an eighth grade student at Nitschmann Middle School, which is part of Appellee Bethlehem Area School District ("School District").[1] Sometime prior to May of 1998, J.S. created a web site on his home computer and posted it on the Internet. The web site was compiled on his own time. The site was not created as part of a school project and was not sponsored by the School District.

1. The transcripts and exhibits offered at the hearing by the School District serve as the basis for the factual record in this case.

The site was entitled "Teacher Sux." It consisted of a number of web pages that made derogatory, profane, offensive and threatening comments, primarily about the student's algebra teacher, Mrs. Kathleen Fulmer and Nitschmann Middle School principal, Mr. A. Thomas Kartsotis.[2] The comments took the form of written words, pictures, animation, and sound clips.

At the outset, the web site contained a disclaimer. The disclaimer stated that "[b]y clicking," i.e., entering, the site, the visitor agreed that, *inter alia,* the visitor would not tell any employees of the School District about the site, that the visitor was not a member of the School District's "Staff," and that the visitor would not disclose the web site to School District employees or administration, disclose the identity of the web site creator or intend to cause trouble for that individual. The disclaimer, however, did not prevent access to the web site and the site was not protected by a password. Thus, any visitor could access the site.

Within the web site were a number of web pages. As noted above, certain of the web pages made reference to Principal Kartsotis. Among other pages was a web page with the greeting "Welcome to Kartsotis Sux." Another web page indicated, in profane terms, that Mr. Kartsotis engaged in sexual relations with a Mrs. Derrico, a principal from another school, Asa Packer School.

The web site also contained web pages dedicated to Mrs. Fulmer. One page was entitled "Why Fulmer Should be Fired." This page set forth, again in degrading terms, that because of her physique and her disposition, Mrs. Fulmer should be terminated from her employment. Another animated web page contained a picture of Mrs. Fulmer with images from the cartoon "South Park" with the statement "That's right Kyle [a South Park character]. She's a bigger b———

---

**2.** The web site also contained web pages that made similarly objectionable comments about Nitschmann Middle School German teacher, Mrs. Maria Spaights. Evidently, however, these statements were not the basis for the discipline imposed upon J.S.

than your mom." [3] Yet another web page morphed a picture of Mrs. Fulmer's face into that of Adolph Hitler and stated "The new Fulmer Hitler movie. The similarities astound me." Furthermore, there was a hand-drawn picture of Mrs. Fulmer in a witch's costume. There was also a page, with sound, that stated "Mrs. Fulmer Is a B____, In D Minor." Finally, along with the criticism of Mrs. Fulmer, a web page provided answers for certain math lessons.

The most striking web page regarding Mrs. Fulmer, however, was captioned, "Why Should She Die?" Immediately below this heading, the page requested the reader to "Take a look at the diagram and the reasons I gave, then give me $20 to help pay for the hitman." The diagram consisted of a photograph of Mrs. Fulmer with various physical attributes highlighted to attract the viewers' attention.[4] Below the statement questioning why Mrs. Fulmer should die, the page offered "Some Words from the writer" and listed 136 times "F ___ You Mrs. Fulmer. You Are A B ____. You Are A Stupid B ____." Another page set forth a diminutive drawing of Mrs. Fulmer with her head cut off and blood dripping from her neck.

Ultimately, students, faculty and administrators of the School District viewed the web site. J.S. told other students about the web site and showed it to another student at school. Other students viewed the web site. A Nitschmann Middle School instructor learned of the web site and reported its existence to Mr. Kartsotis. Mr. Kartsotis proceeded to view portions of the web site.

Believing the threats to be serious, Mr. Kartsotis convened a faculty meeting. The members of the faculty were informed that there was a problem at the school. However, the teachers were not told of the specific nature of the situation.

3. For purposes of this opinion, blanks will be used rather than the actual profane words that were spelled out in the web site.

4. Lines from the photograph of Mrs. Fulmer connected to four statements regarding the author's reasons why Mrs. Fulmer should "die." The statements were: (1) "Is it a rug, or God's Mistake?" (2) "Puke Green Eyes" (3) "Zit!" and (4) "Hideous smile."

Furthermore, Mr. Kartsotis contacted local police authorities as well as the Federal Bureau of Investigation. After investigation, both agencies identified J.S. as the creator of the site. However, the law enforcement agencies declined to file charges against J.S.

Also upon viewing the web site, Mr. Kartsotis, taking the threats seriously, informed Mrs. Fulmer of the existence of the site. After viewing the site, Mrs. Fulmer testified that she was frightened, fearing someone would try to kill her. Mrs. Fulmer suffered stress, anxiety, loss of appetite, loss of sleep, loss of weight, and a general sense of loss of well being as a result of viewing the web site. She suffered from short-term memory loss and an inability to go out of the house and mingle with crowds. Mrs. Fulmer suffered headaches and was required to take anti-anxiety/anti-depressant medication.

Furthermore, Mrs. Fulmer was unable to return to school to finish the school year. She applied for and was granted a medical leave for the 1998–99 school year because of her inability to return to teaching. As a result of Mrs. Fulmer's inability to return to work, three substitute teachers were required to be utilized which disrupted the educational process of the students.

The web site also had a demoralizing impact on the school community. Mr. Kartsotis explained, *inter alia,* that the effect of the site on Nitschmann Middle School caused the school to be at a low point that was worse than anything that he had encountered in forty years of education. Furthermore, the effect on the morale of the students and staff at Nitschmann Middle School was comparable to the death of a student or staff member.

During this time, J.S. continued to attend classes and participate in extra-curricular activities, including a band trip. The School District did not request that J.S. remove the site. Evidently, J.S., on his own, removed the web site approximately one week after Mr. Kartsotis became aware of the site. Moreover, the School District took no action to confront or to punish J.S. in any manner during the remainder of the school

year. Finally, the School District did not refer J.S. for any type of psychological evaluation and did not request that his parents have any such evaluation conducted.

However, after the end of the school year, on July 30, 1998, the School District sent a letter to J.S. and his parents informing them that it was aware of the web site and that it intended to suspend the student for three days. The letter asserted that J.S. violated School District policy through three Level III infractions: threat to a teacher, harassment of a teacher and principal, and disrespect to a teacher and principal, each resulting in actual harm to the health, safety and welfare of the school community. After a hearing on the suspension, the School District opted to extend the suspension to ten days, effective the beginning of the 1998–99 school year. Shortly thereafter, the School District began expulsion proceedings against the student.

The expulsion hearings were conducted on August 19 and 26, 1998. However, by that time, the parents of J.S. had enrolled the student in an out-of-state school for the coming year. Thus, J.S. was unable to attend the August 26, 1998 hearing.

The School District concluded that (1) the student's statements: "Why Should [Mrs. Fulmer] Die?" and "give me $20 to help pay for the hitman" constituted a threat to a teacher and was perceived by Mrs. Fulmer and others as a threat; (2) the statements regarding Mr. Kartsotis and Mrs. Fulmer constituted harassment of a teacher and a principal; (3) the statements constituted disrespect to a teacher and principal resulting in actual harm to the health, safety, and welfare of the school community; (4) the School District Code of Conduct prohibited such student conduct and engaging in such action could result in expulsion; and (5) the statements caused an actual harm to Mrs. Fulmer, as well as to other students and teachers. As a result of these findings, the School District voted to expel J.S.

J.S., by and through his parents, appealed the School District's determination to the Court of Common Pleas of Northampton County, arguing, *inter alia,* that the School District

violated J.S.'s First Amendment rights. The trial court affirmed. Thereafter, J.S. appealed to the Commonwealth Court. A three-member panel of the Commonwealth Court affirmed.

Specifically, a two-member majority of the court, in an opinion authored by Judge Jess S. Jiuliante, characterized the issue as whether a student may be disciplined for speech occurring off of school premises and communicated to others via the Internet. The court concluded that courts have permitted school officials to discipline students for conduct occurring off school premises where the conduct materially and substantially interferes with the educational process. The court pointed to the damaging effects on Mrs. Fulmer, Mr. Kartsotis and the school community and concluded that the school district did not violate J.S.'s First Amendment rights. Moreover, the majority noted that in this day and age where school violence is becoming more commonplace, school officials are justified in taking threats against faculty and students seriously.

Judge Rochelle Friedman dissented. She concluded that the web site did not constitute a "true threat." Furthermore, because in her opinion the web site only affected Mrs. Fulmer personally, there was no evidence of a material disruption of class work or substantial disorder as to place the speech "outside the protections of the First Amendment."

 J.S. appealed to our court. We granted allocatur to review the issue of whether the Commonwealth Court erred in its conclusion that the School District did not violate J.S.'s First Amendment rights by punishing him for the posting of the "Teacher Sux" web site.[5,6,7]

5. J.S. does not allege that the School District violated J.S.'s rights under the Pennsylvania Constitution. Pa. Const. art. I, § 1, 7. Nor does J.S. contend that the protections granted under this Commonwealth's Constitution are greater than those provided for under the United States Constitution. *See Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991). Thus, we limit our consideration to the First Amendment to the United States Constitution.

6. The authority of public school officials is that of the state. Thus, public school officials are constrained by the Bill of Rights, and more

The First Amendment to the United States Constitution provides:

**Congress shall make no law** respecting an establishment of religion, or prohibiting the free exercise thereof; or **abridging the freedom of speech,** or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I (emphasis supplied).

■ The heart of this amendment has been described as the "ineluctable relationship between the free flow of information and a self-governing people." *Thomas v. Board of Education, Granville Central School District,* 607 F.2d 1043, 1047 (2nd Cir.1979) (citing *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). As protector of this exchange of ideas, the First Amendment, as a general proposition, "prevents government from proscribing speech ... because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Courts, in general, have jealously guarded the right to free speech.

Furthermore, free speech is of special value in the school setting. Schools offer a laboratory-like setting that encourages diverse thoughts. The classroom is an integral part of the marketplace of ideas. Robust exchange of views leads to truth emerging from a "multitude of tongues, (rather) than through any kind of authoritative selection." *Keyishian v.*

specifically, the First Amendment. *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). The First Amendment's protection of our freedom of speech is made applicable to our Commonwealth through the Fourteenth Amendment. *Fiske v. Kansas,* 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108 (1927).

7. A school district is deemed to be a local agency for purposes of judicial review. In reviewing a local agency determination, an appellate court must affirm the local agency's judgment unless the local agency has made a constitutional error; committed an error of law; there has been a procedural irregularity; or the necessary findings of fact are not supported by substantial evidence. 2 Pa. C.S.A. § 754(b). As the issue in this case deals with whether the local agency committed constitutional error, our standard of review is *de novo.*

*Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (citations and quotations omitted).

■ However, while the freedom of speech is rightfully cherished, it is also clear that this right of free speech "is not absolute at all times and under all circumstances." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). For example, certain types of speech can be regulated if they are likely to inflict unacceptable harm. These narrow categories of unprotected speech include "fighting words," *Chaplinsky,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); speech that incites others to imminent lawless action, *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); obscenity, *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); certain types of defamatory speech, *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); and "true threats." *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). Thus, certain classes of speech may be regulated, or even punished, by government and such action will not violate the Constitution.

Additionally, in interpreting the First Amendment, the United States Supreme Court has recognized that the unbridled free expression of speech is not permissible in every setting. *See Perry Education Assoc. v. Perry Local Educators' Assoc.,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Thus, in certain settings, the expression of speech, that would otherwise be unfettered, has been subject to some regulation and even punishment. One of these settings is in the unique environment of our nation's schools. *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). *See also, Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988); *Bethel School District No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986).

The United States Supreme Court, as well as this court, has recognized that the school setting is indeed unique, perhaps even *sui generis.* Schools are given the monumental charge

of molding our children into responsible and knowledgeable citizens. As noted by the Court, the educational purpose of the school is not limited to academics, as educators must inculcate our children with "the habits and manners of civility." *Fraser*, 478 U.S. at 681, 106 S.Ct. 3159. Part of a school's awesome charge is to balance the exercise of rights that enrich learning with order and a safe and productive school environment. However, balancing the constitutional rights of schoolchildren and the necessity for a school environment that is conducive to learning is a complex and delicate task.

Both federal and state courts have been required to address this difficult jurisprudential task where constitutional issues intersect with the unique school setting. In various situations, the high courts of both the United States and Pennsylvania have performed the delicate balancing and concluded that the constitutional interests of the student, in certain circumstances, must yield to the school officials' need to maintain order and to discipline when necessary to assure a safe school environment that is conducive to learning. *Vernonia School District 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)(refusing to require individualized suspicion to support drug testing of student-athletes to deter drug use by students); *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)(rejecting requirement of probable cause or warrants to search of student by school officials and applying only a warrantless reasonable suspicion standard); *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)(declining to extend Eighth Amendment protection against cruel and unusual punishment to corporal punishment of students); *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)(requiring minimal process for temporary disciplinary suspensions from school); *In re F.B.*, 555 Pa. 661, 726 A.2d 361 (1999)(rejecting requirement of individual reasonable suspicion in *sui generis* school environment where search conducted of all children); *Commonwealth v. Cass*, 551 Pa. 25, 709 A.2d 350 (1998)(requiring only reasonable suspicion for search of school locker).

■ As will be discussed below in greater detail, the same is true with respect to the freedom of speech in the school setting. *Kuhlmeier; Fraser; Tinker.* Thus, in considering whether the School District violated J.S.'s constitutional rights in this case, we must adopt a cautious approach that considers and balances both the constitutional rights of the student with the preservation of order and a proper educational environment. It is with this background that we turn to the arguments advanced by the parties.

J.S. contends that the lower tribunals erred because, by expelling him, the School District violated his constitutionally guaranteed right of free speech. Specifically, J.S. argues that while a student's right to the protections offered by the First Amendment may not be absolute, under relevant United States Supreme Court case law, the School District did not meet its burden of establishing a sufficient disruption of the school environment to limit J.S.'s off-campus speech. Moreover, the student maintains that the web site did not contain a "true threat" or other speech that would be beyond all First Amendment protection.

The School District counters that J.S.'s expulsion was not contrary to constitutional protections. While the student created the site at home, it was accessed at school. Thus, the communication constituted on-campus speech that caused a material and substantial disruption of the school environment. Thus, the School District was entitled to take disciplinary action against J.S. Furthermore, the School District urges that the web site constituted a "true threat," and thus, is not speech that is protected by the First Amendment.

■ In reviewing the parties' arguments, we will first consider whether the web site contained a "true. threat." As noted above, if the speech authored by J.S. constituted a true threat, as defined by the case law, it receives no constitutional protection. Unprotected by the First Amendment, the School District would have the authority to discipline J.S. for such speech and our inquiry would end. However, even if not a "true threat," the School District might not have violated J.S.'s

constitutional right to free speech by disciplining him if the speech was otherwise protected, but it in some fashion disrupted school work or invaded the rights of others. As discussed in greater detail below, this is because otherwise protected speech nonetheless may be subject to restriction in a school setting. *See Tinker.* Thus, we initially turn to consider whether J.S.'s web site constituted a "true threat."

A "true threat" is a certain class of speech that the United States Supreme Court has determined is beyond the protective ambit of the First Amendment. *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). A true threat may be criminally punished and the majority of case law that considers whether certain speech constitutes a true threat arises in the context of a conviction for the violation of a criminal statute that prohibits such threats. *See, e.g., Watts,* (reviewing conviction under 18 U.S.C. § 871(a)(prohibition on threat against President of United States)); *United States v. Himelwright,* 42 F.3d 777 (3d Cir.1994)(reviewing conviction under 18 U.S.C. § 875(c)(prohibition on the interstate transmission of a threat to injure another person)). Consideration of what constitutes a true threat, however, is not limited solely to the criminal realm. *Lovell By and Through Lovell v. Poway Unified School District,* 90 F.3d 367 (9th Cir.1996)(addressing whether suspension for threat to teacher violated student's First Amendment rights). As J.S.'s web site was not the basis for criminal charges, this is the context in which we too will consider his statements.

In *Watts,* the United States Supreme Court first announced that "true threats" fell outside of the protection of the First Amendment. *Watts,* 394 U.S. at 708, 89 S.Ct. 1399. In that case, eighteen-year-old Robert Watts, an antiwar demonstrator, told a crowd of demonstrators at a public rally on the grounds of the Washington Monument that "if they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.,* 394 U.S. at 706, 89 S.Ct. 1399. Watts was convicted under a federal statute prohibiting threats against the President. *Id.* The Court focused its inquiry on the question of whether the speech at issue constituted a threat or

constitutionally protected speech. The Court upheld the constitutionality of the statute, but reversed Watts' conviction. Concluding that Watts' statement was mere "political hyperbole," the Court found that the government failed to meet its burden of establishing a "true threat," *Id.* at 708, 89 S.Ct. 1399. While not specifically defining "true threat," the Court noted that "[t]aken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise." *Id.*

Unfortunately, the United States Supreme Court has offered little more since rendering its decision in *Watts,* in terms of guidelines to adjudge what constitutes a true threat. Although the United States Supreme Court has not returned to the issue, lower federal courts and states courts have attempted to further define what constitutes a true threat and to create a standard to evaluate speech alleged to constitute a true threat. A few courts have done so in the context of student speech. Two of these cases are instructive and worthy of brief review.

In *Lovell By and Through Lovell v. Poway Unified School District,* 90 F.3d 367 (9th Cir.1996), Sarah Lovell, a 10th grade student, frustrated and irritated from being shuttled between the guidance office and the administrative offices while attempting to effectuate changes to her class schedule, threatened a school guidance counselor that she would shoot her if the counselor did not make changes to the student's class schedule. The school district suspended Lovell for three days. The student brought suit in federal court and claimed that by punishing her as a result of her speech, the school district violated, *inter alia,* her First Amendment rights. The magistrate judge who heard the case agreed.

On appeal, the Court of Appeals for the Ninth Circuit considered whether Lovell's comments constituted a true threat, and thus, were not entitled to First Amendment protection. The court opined that in determining whether speech constitutes a true threat, the standard was whether a reasonable person in the student's position would foresee that the

statement would be interpreted as a serious expression of intent to harm or assault. *Lovell*, 90 F.3d at 372. The entire factual context of the alleged threats was to be considered including surrounding events and the reaction of listeners. Other considerations included whether the threat was unequivocal, unconditional, immediate and specific as to convey a gravity of purpose and immediate prospect of execution. *Id.* (citing *United States v. Kelner*, 534 F.2d 1020, 1027 (2nd Cir.1976)). Applying these tests, and considering the comments against the backdrop of violence prevalent in schools today, the court concluded that the student's threat to shoot her guidance counselor was a true threat.

Similarly, in *In the Interest of A.S.*, 243 Wis.2d 173, 626 N.W.2d 712 (2001), the Supreme Court of Wisconsin was faced with an appeal involving a delinquency petition brought against A.S., a thirteen-year-old student, which arose from a disorderly conduct charge. The charge was based on a factual scenario in which A.S. made threatening comments to other youths. The statements, made to two girls at a local youth center, were that the student was going to kill everyone at the middle school, that this would occur over ten minutes, and that it would be something similar to the shootings in Columbine, Colorado. The student explained in a very-matter-of-fact manner that people would suffer. Furthermore, the student described in detail how he was going to hang a local police officer, shoot the middle school principal and a social studies teacher, and rape a fellow student.

In considering whether A.S.'s comments were protected under the First Amendment, the court employed an objective reasonable person standard,[8] defining a true threat as a

8. In the context of a prosecution of a threat under a criminal statute, there appears to be some controversy regarding the type of intent that is required before one can be convicted. The vast majority of courts that have considered whether an objective reasonable person standard, resting upon reasonable foreseeability, or a specific intent standard is appropriate, have concluded that an objective standard should be applied. *See United States v. Francis*, 164 F.3d 120, 123 (2d Cir.1999); *United States v. Whiffen*, 121 F.3d 18, 21 (1st Cir.1997); *United States v. Myers*, 104 F.3d 76, 81 (5th Cir.1997); *Lovell*, 90 F.3d at 372; *United States v. Himelwright*, 42 F.3d 777, 782–83 (3d Cir.1994); *United States*

statement that a speaker would reasonably foresee that a listener would reasonably interpret as a serious expression of a purpose to inflict harm, i.e., to intimidate or inflict bodily harm, as distinguished from hyperbole, jest, innocuous talk, expressions of political views or other similarly protected speech. *In the Interest of A.S.,* 626 N.W.2d at 720. In engaging in this analysis, the court offered that it was the totality of the circumstances that had to be considered. It was not necessary that the speaker have the ability to carry out the threat. Rather, consideration was to be given to the full context of the statement, including all relevant factors as to how the statement could be interpreted.

Factors to be considered included how the recipient and other listeners reacted to the alleged threat; whether the threat was conditional; whether it was communicated directly to its victim; whether the makers of the threat had made similar statements to the victim on other occasions; and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence. *Id.* Rejecting the argument that this was an extreme level of "trash talking," and applying the test to the student's statements, the Wisconsin court found that the statements constituted a true threat. *Id.* at 721.

█ We believe that the standards and considerations set forth in these decisions are consistent with *Watts,* and serve as valuable guideposts in discerning whether certain speech falls within the narrow definition of a "true threat," that is, if the communication is a serious expression of intent to inflict harm. Thus, we will consider the statements, the context in which they were made, the reaction of listeners and others as well as the nature of the comments in determining whether the communications at issue constitute a true threat.

*v. Darby,* 37 F.3d 1059, 1066 (4th Cir.1994); *United States v. DeAndino,* 958 F.2d 146, 149 (6th Cir.1992); *In the Interest of Douglas D.,* 243 Wis.2d 204, 626 N.W.2d 725, 740 (2001); *but see* Robert Kurman Kelner, Note, *United States v. Jane Baker: Revisiting Threats and the First Amendment,* 84 Va. L.Rev. 287 (1998). As J.S. is not being subjected to prosecution pursuant to a criminal statute, we need not resolve this apparent controversy.

We first examine the specific statements at issue. As stated above, the most striking portions of the web site asks why Mrs. Fulmer should die, shows a picture of Mrs. Fulmer's head severed from her body and solicits funds for a hitman. However, we must also look at the web site beyond these bare statements to understand the full context in which they were made. In asking why Mrs. Fulmer should die, the site refers to a diagram. This diagram contains a picture of Mrs. Fulmer with lines drawn to various parts of the picture of her face. The diagram lists: hideous smile, a zit, puke green eyes, and asks if her hair is "a rug, or God's Mistake?" Furthermore, immediately after asking why Mrs. Fulmer should die, the site lists "F___ You Mrs. Fulmer. You Are A B___. You Are A Stupid B___." 136 times on approximately two pages. The request for $20 to help pay for the hitman contains no address to which individuals should forward the funds.

Outside of these statements, as noted above, the web site also contains images of Mrs. Fulmer alongside those from the cartoon "South Park." Moreover, the web site contemplates the similarities between Mrs. Fulmer and Adolph Hitler. There is a hand drawn picture of Mrs. Fulmer in a witch's costume and a song about Mrs. Fulmer. "Why Fulmer Should Be Fired" is another page of the site which lists reasons, primarily sophomoric, yet degrading, statements regarding Mrs. Fulmer's looks. The web site also contains answers for certain math lessons.

The reaction of one of the intended victims, Mrs. Fulmer, is noted above. Mrs. Fulmer suffered severe mental and physical harm from viewing the site. Mrs. Fulmer was unable to finish the school year and took medical leave the next year. The reaction of some viewers was evidently quite different. The web site contained comments from viewers. The site made one viewer, "laugh" and made another viewer, "crack up." Administrators from the school also responded to the web site. Mr. Kartsotis treated the site as a threat. Authorities were called, although no charges were filed. The School District did not segregate J.S. from the school population and permitted J.S. to go on an out-of town overnight school-

sponsored band trip. The School District did not immediately confront or discipline J.S. Nor was he referred for counseling. Rather, it was only after the school year that his parents were notified of the web site and that suspension and expulsion proceedings were held.

The threatening statements were not conditional. Rather, the statements regarding solicitation of a hitman and the questions as to why Mrs. Fulmer should die were stated unconditionally and unequivocally. However, the threatening statements and the web site itself were not communicated directly to Mrs. Fulmer. On the contrary, it appears that the disclaimer evidenced an intent that school faculty should not view the web site. Furthermore, there is no evidence that J.S. had made similar statements to Mrs. Fulmer on other occasions. Finally, while Mrs. Fulmer was fearful after viewing the web site, it is unclear if Mrs. Fulmer had any reason to believe that J.S. had the propensity to engage in violence, more than any other student of his age.

Cognizant of the narrowness of the exceptions to the right of free speech, and the criminal nature of a true threat analysis, we conclude that the statements made by J.S. did not constitute a true threat, in light of the totality of the circumstances present here. We believe that the web site, taken as a whole, was a sophomoric, crude, highly offensive and perhaps misguided attempt at humor or parody. However, it did not reflect a serious expression of intent to inflict harm. This conclusion is supported by the fact that the web site focused primarily on Mrs. Fulmer's physique and disposition and utilized cartoon characters, hand drawings, song, and a comparison to Adolph Hitler. While Mrs. Fulmer was offended, certain others did not view it as a serious expression of intent to inflict harm. Indeed, the actions, or inaction, by the School District belies its assertion that the web site constituted a true threat. To allow J.S. to attend class and extracurricular activities, even if during an investigation, and to only commence discipline well after the conclusion of the school year, severely undermines the School District's position that the web site contained a true threat. The lack of immediate steps

taken directly against J.S., and the lack of immediate notification of his parents about the web site, for the extended time period that passed in this case, strongly counters against a conclusion that the statements made in the web site constituted true threats.[9] Thus, we hold that the web site did not contain true threats, as that term is defined by the prevailing case law.

■■■ By our determination regarding this issue, however, we do not belittle the harm that Mrs. Fulmer has suffered. Moreover, the Court of Appeals for the Ninth Circuit has specifically noted that school officials are justified, given the modern rash of violent crimes in school settings, in taking very seriously student threats against faculty or other students. *Lovell,* 90 F.3d at 372. We too appreciate that in schools today violence is unfortunately too common and the horrific events at Columbine High School, Colorado remain fresh in the country's mind. However, we find that the speech at issue does not rise to the level of a true threat. Distasteful and even highly offensive communication does not necessarily fall from First Amendment protection as a true threat simply because of its objectionable nature.

However, our consideration of whether the statements in the "Teacher Sux" web site constituted a true threat does not end our inquiry. Even if the statements made by J.S. did not amount to true threats, we must consider whether the School District may nevertheless punish J.S. for making such statements without running afoul of the dictates of the First Amendment.

As noted above, student rights must be considered and applied in light of the special circumstances of the school environment. There is a tension between the constitutional rights of schoolchildren and the school's need for order and an

9. While we find the School District's failure to directly respond to the perceived threat for an extended period of time to be of great importance, we caution that the fact that a threat is not dealt with immediately is not dispositive of the issue of whether certain statements constitute a true threat. Exhibiting some "fortitude and stoicism" does not necessarily vitiate the threatening nature of speech. *See Lovell,* 90 F.3d at 373 (instructor waited a few hours to report verbal threat).

educational environment that is safe, structured and conducive to learning. There exists an "obvious concern on the part of parents, and school authorities acting *in loco parentis,* to protect children[.]" *Fraser,* 478 U.S. at 684, 106 S.Ct. 3159. "Without first establishing discipline and maintaining order, teachers cannot begin to educate their students." *New Jersey v. T.L.O.,* 469 U.S. at 350, 105 S.Ct. 733 (Powell, J., concurring). Thus, as discussed below, otherwise protected speech may in some circumstances be subject to restriction and even punishment.

The seminal case dealing with the collision between a student's constitutional right to free speech and a school district's mandate to maintain an educational environment conducive to learning is *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In *Tinker,* a group of students planned to wear black armbands to high school to demonstrate their objections to the war in Vietnam and their support for a truce. The school district, upon learning of the plan, adopted a policy that any student wearing an armband to school would be asked to remove it, and if the student refused, the student would be suspended until he or she returned to school without the armband. Two days after the adoption of the no-armband policy, the students wore black armbands to school. The school district suspended the students. The students sought an injunction to restrain the school district from imposing the suspensions. The lower courts upheld the constitutionality of the school district's action.

On appeal, the United States Supreme Court, in an oft-quoted passage, made clear that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker,* 393 U.S. at 506, 89 S.Ct. 733. The Court, however, clearly recognized the necessity of the school's educational mission: "But conduct by the student, in class or out of it, which for any reason—whether it stems from

time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513, 89 S.Ct. 733. Yet the Court, in reconciling the competing concerns of the right to free speech and the needs of the educational environment, cautioned that the disruption, disorder or invasion of rights, must be substantial. It wrote: "[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508, 89 S.Ct. 733.

Ultimately, the Court determined that for the school to prohibit certain expression, "it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509, 89 S.Ct. 733. "[W]here there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained." *Id.* (quoting *Burnside v. Byars,* 363 F.2d 744, 749 (5th Cir. 1966)).

While an actual material disruption of the school environment would permit a school district to take action, the Court in *Tinker* also made clear that school officials do not have to wait for possible harm or material disruption to come to pass before taking appropriate steps. School officials may justify their decision to suppress speech by demonstrating "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Tinker,* 393 U.S. at 514, 89 S.Ct. 733.[10] The Court

10. *See also Chandler v. McMinnville School District,* 978 F.2d 524 (9th Cir.1992). In fact, it has been offered that school officials, "have a duty to prevent the occurrence of disturbances." *Karp v. Becken,* 477 F.2d 171, 175 (9th Cir.1973). Moreover, due to the importance of the educational environment and the state's interest therein, the level of disturbance required to justify action "is relatively lower in a public school than it might be on a street corner." *Id.* Finally, this ability to forecast a substantial disruption is not limited to prior-restraint cases, but applies to punishment after publication. *Boucher v. School Board of the School District of Greenfield,* 134 F.3d 821, 828 (7th Cir.1998).

concluded that the school district had no reason to anticipate that the wearing of the armbands would substantially disrupt or materially interfere with school activities and no such disorder in fact occurred.

In sum, the Court in *Tinker* established that although a student does not shed his or her constitutional right to free speech in the school setting, a school district might, within constitutional bounds, prohibit speech and punish a student for speech, if the school sustains its burden of establishing that the student speech materially disrupts class work, creates substantial disorder, invades the rights of others or it is reasonably foreseeable that the speech will do so.

Two cases rendered by the United States Supreme Court subsequent to *Tinker* have also addressed student speech in the context of the First Amendment, and perhaps define the limits of *Tinker*. These cases differed from *Tinker's* focus on the role of First Amendment values at school and instead emphasized the broad power of school authorities to discipline a student for certain speech, emphasizing the importance of the educational mission of the school.

In *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), Matthew Fraser, a seventeen-year old high school student, gave a nominating speech on behalf of a classmate during an official school-wide assembly for student government elections. In the speech promoting the candidate, Fraser used sexual innuendos. Reaction to the speech was mixed; some students yelled and simulated sexual acts while other students and teachers were offended and embarrassed. Due to his use of profane and obscene language in the speech, Fraser was suspended for three days and prohibited from speaking at graduation.

The United States Supreme Court granted certiorari to decide whether the First Amendment prohibited the school district from disciplining a high school student for giving a lewd speech at a school assembly. Differing from *Tinker's* emphasis on a student's individual rights, the Court in *Fraser* emphasized the school's responsibility in imparting upon stu-

dents lessons of civilized behavior and the importance of protecting minors from vulgar language. *Fraser,* 478 U.S. at 681, 106 S.Ct. 3159. Further, the Court underscored the lesser rights of schoolchildren: "constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Id.* at 682, 106 S.Ct. 3159. Because it was an appropriate function for the public school to prohibit the use of vulgar and offensive terms in public discourse, the Court opined that it is up to school officials to determine what manner of speech in the classroom or in school assembly is inappropriate. *Id.* at 683, 106 S.Ct. 3159. "[S]chools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as that indulged in by this confused boy." *Id.*

Relying upon these twin themes of the importance of the school's educational mandate as well as the diminished rights of school children, the Court concluded that the school district acted within its authority in disciplining Fraser for his offensive, lewd and indecent speech. *Id.* at 685, 106 S.Ct. 3159. Distinguishing the political speech at issue in *Tinker,* the Court noted, a school district might find that vulgar and lewd speech would undermine the school's educational mission. "A high school assembly or classroom is no place for a sexually explicit monologue directed towards an unsuspecting audience of teenage students." Id.

Two years later, in *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Court again considered student speech and upheld limitations on school-sponsored speech. In *Kuhlmeier,* a high school principal pulled two stories that concerned teen pregnancy and parental divorce from a high school newspaper produced as part of the school's journalism curriculum. In rejecting three staff members' First Amendment challenge to the editing, the Court first found that the newspaper was not a forum for public expression. *Kuhlmeier,* 484 U.S. at 270, 108 S.Ct. 562. The Court then distinguished *Tinker* on the basis that

*Tinker* went to the educator's ability to silence a student's personal expression that happens to occur on the school premises. However, the question before the Court in *Kuhlmeier* concerned the educatory authority over school-sponsored publications, productions and other expressive activities that students, parents and the public might believe bore the imprimatur of the school. *Id.* at 270–72, 108 S.Ct. 562.

Important to the case before us, the Court found that educators are able to restrict school-sponsored speech to a greater degree than a student's personal expression:

> Educators are entitled to exercise greater control over this second form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school. Hence, a school may in its capacity as publisher of a school newspaper or producer of a school play "disassociate itself," *Fraser*, 478 U.S., at 685, 106 S.Ct., at 3165, not only from the speech that would "substantially interfere with [its] work ... or impinge upon the right of other students," *Tinker*, 393 U.S., at 509, 89 S.Ct., at 738, but also from speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences.

*Id.* at 271, 108 S.Ct. 562.

The Court concluded that school officials, as publishers of the school newspaper, were permitted to exercise editorial control over the style and content of the speech in school-sponsored expressive activities if the actions were reasonably related to legitimate pedagogical concerns. *Id.* at 273, 108 S.Ct. 562.

In addressing the dissent, the *Kuhlmeier* Court shed some light on the relationship between *Tinker* and *Fraser*. The *Kuhlmeier* majority disagreed with the *Kuhlmeier* dissent's assertion that there was no difference in the First Amendment

analysis applied in *Tinker* versus that utilized in *Fraser*. The majority reasoned that:

> The decision in *Fraser* rested on the "vulgar," "lewd," and "plainly offensive" character of a speech delivered at an official school assembly rather than on any propensity of the speech to "materially disrup[t] classwork or involv[e] substantial disorder or invasion of the rights of others." Indeed, the *Fraser* Court cited as "especially relevant" a portion of Justice Black's dissenting opinion in *Tinker*, " 'disclaim[ing] any purpose . . . to hold that the Federal Constitution compels teachers, parents and elected school officials to surrender control of the American public school system to public school students.' "

*Kuhlmeier*, 484 U.S. at 272 n. 4, 108 S.Ct. 562.

Unfortunately, the United States Supreme Court has not revisited this area for fifteen years. Thus, the breadth and contour of these cases and their application to differing circumstances continues to evolve. Moreover, the advent of the Internet has complicated analysis of restrictions on speech. *See Ashcroft v. American Civil Liberties Union, et al.,* 2002 U.S. Lexis 3421 (May 13, 2002) (plurality) (unique character of the Internet impacting issue of application of community standards jurisprudence found in Child Online Protection Act to that medium). Indeed, *Tinker's* simple armband, worn silently and brought into a Des Moines, Iowa classroom, has been replaced by J.S.'s complex multi-media web site, accessible to fellow students, teachers, and the world.

■■■ What can be said, based upon these student expression cases, is that any constitutional analysis of a student's freedom of speech must include a number of considerations. First, a threshold issue regarding the "location" of the speech must be resolved to determine if the unique concerns regarding the school environment are even implicated, i.e., is it on campus speech or purely off-campus speech? As noted by the Court in *Kuhlmeier*, "[a] school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech

outside the school." *Kuhlmeier,* 484 U.S. at 266, 108 S.Ct. 562. *See also Fraser,* 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986)(First Amendment rights of students in the public schools "are not automatically coextensive with the rights of adults in other settings.").

 If it is determined that the speech is on-campus, other factors must be considered: the form of speech, (i.e., political, lewd, vulgar, offensive or other); the effect of the speech, (i.e., level of disruption); the setting in which the speech is communicated, (i.e., school assembly, classroom or other); and finally, whether the speech is part of a school sponsored expressive activity, (i.e., newspaper or play).

 Thus, we first turn to the threshold consideration of location. J.S. and his parents suggest that the speech was purely off-campus speech, which would arguably be subject to some higher level of First Amendment protection than on-campus speech. *See Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Conversely, the School District contends that this is on-campus speech and should be analyzed by application of *Fraser* or *Tinker.* Thus, in attempting to discern the proper standard by which to evaluate the School District's discipline of J.S., we must first determine whether the speech at issue was on-campus speech and thus, subject to United States Supreme Court's student expression case law.[11]

Only a few courts have considered whether the off-campus posting of email or a web site, and the accessing of the mail or site at school, constitutes on-campus or off-campus speech. These cases have differed in their conclusions. *See Killion v. Franklin Regional School District,* 136 F.Supp.2d 446

11. Although not before our court, we do not rule out a holding that purely off-campus speech may nevertheless be subject to regulation or punishment by a school district if the dictates of *Tinker* are satisfied. *See Thomas v. Bd. of Educ., Granville Central School District,* 607 F.2d 1043, 1052 n. 17 (2d Cir.1979)(envisioning a case in which a group of students could incite substantial disruption within the school from some off-campus locale).

(W.D.Pa.2001)(where email was created off campus, but printed and carried on school grounds by others, court surveyed case law and determined that, whether speech on-or-off campus, speech should be analyzed in accordance with *Tinker*); *Emmett v. Kent School District No. 415*, 92 F.Supp.2d 1088 (W.D.Wash.2000)(in granting temporary restraining order in favor of student, web site characterized as having "out-of-school nature"); *Beussink v. Woodland R–IV School District*, 30 F.Supp.2d 1175 (E.D.Mo.1998)(implicitly finding web site on-campus speech where student accessed the web site in library and teacher and other students accessed the website on school computers).

In different contexts, other courts have applied the student expression case law where off-campus speech has been imported onto school grounds. *Baker v. Downey City Board of Education*, 307 F.Supp. 517, 526 (C.D.Ca.1969) (distribution of underground paper outside gate of campus did not militate against fact that student knew other students entering campus for class and would distribute paper on campus); *see, Boucher v. School District of Greenfield*, 134 F.3d 821, 828–29 (7th Cir.1998) (student expression case law applies to underground newspaper distributed on school campus); *Bystrom v. Fridley High School*, 686 F.Supp. 1387 (D.Minn.1987) (student expression case law applies where unofficial newspaper distributed in lunch room); *Pangle v. Bend–Lapine School District*, 169 Or.App. 376, 10 P.3d 275 (2000) (same, where on campus distribution of underground newspaper); *cf., Fenton v. Stear*, 423 F.Supp. 767, 772 (W.D.Pa.1976) (calling a teacher a lewd name in a public place subjected student to discipline by school authorities); *but see Thomas v. Bd. of Educ., Granville Central School District*, 607 F.2d 1043, 1050 (2d Cir.1979) (school activity *de minimis* where publication printed outside school and not sold on school grounds, but few articles transcribed on school typewriters and finished product stored in teacher's closet).

We find there is a sufficient nexus between the web site and the school campus to consider the speech as occurring on-campus. While there is no dispute that the web site was

created off-campus, the record clearly reflects that the off-campus web site was accessed by J.S. at school and was shown to a fellow student. While it is less certain exactly what portions of the web site the student viewed, J.S., nevertheless, facilitated the on-campus nature of the speech by accessing the web site on a school computer in a classroom, showing the site to another student, and by informing other students at school of the existence of the web site. Related thereto, faculty members and the school administration also accessed the web site at school. Importantly, the web site was aimed not at a random audience, but at the specific audience of students and others connected with this particular School District; Mrs. Fulmer and Mr. Kartsotis were the subjects of the site. Thus, it was inevitable that the contents of the web site would pass from students to teachers, inspiring circulation of the web page on school property. We hold that where speech that is aimed at a specific school and/or its personnel is brought onto the school campus or accessed at school by its originator, the speech will be considered on-campus speech.[12]

However, even after this threshold consideration of the location of the speech is established, the type of speech, the unique setting and manner in which the speech was circulated, and the personal nature of the speech make it difficult to apply any one of the three United States Supreme Court cases above. Specifically, we do not have before us the political message that was brought into the classroom and was at issue in *Tinker*—political speech that was emphasized as demanding greater protection than the lewd, vulgar and offensive speech at issue in *Fraser*. However, the circumstances before us are also not on all fours with *Fraser*. Certainly, the speech at bar could be considered lewd, vulgar and offensive. It was not, however, expressed at any official school event or even during a class, subjecting unsuspecting listeners to offen-

12. While the fact that J.S. personally accessed his website on school grounds is a strong factor in our assessment, we do not discount that one who posts school-targeted material in a manner known to be freely accessible from school grounds may run the risk of being deemed to have engaged in on-campus speech, where actual accessing by others in fact occurs, depending upon the totality of the circumstances involved.

sive language. Rather the speech was latent in nature requiring a viewer to affirmatively access the web site, that is, finding its way onto school grounds in an informal manner. Furthermore, there is no suggestion that the School District sponsored the speech, giving it editorial license to restrict its content, like in *Kuhlmeier*.

In essence, the type of speech at issue in this case straddles the political speech in *Tinker*, and the lewd and offensive speech expressed at an official school assembly in *Fraser*. Courts in similar positions have varied in their application of the United States Supreme Court's student expression case law to the student speech at issue.

The few courts that have considered Internet communication have focused upon *Tinker* in their analysis. In *Beussink v. Woodland R–IV School District*, 30 F.Supp.2d 1175 (E.D.Mo.1998), a high school student was suspended for the contents of his web site that contained vulgar criticism directed toward school officials. The web site was created at home on the student's personal computer without using school facilities or resources. However, a friend of the student became angry with the student, accessed the web site at the school and showed it to the school's computer science teacher. The teacher informed the principal of the site and immediately after viewing the site, the principal decided to suspend the student. Due to school policy regarding absenteeism, the suspension resulted in the student failing all his classes.

In a footnote, the court drew a distinction between school-sponsored speech, citing *Kuhlmeier*, and personal expression that happens to take place on school property, citing to *Tinker*. Without citation to *Fraser*, and making no distinction between lewd and offensive speech and political speech, the court relied upon *Tinker* in granting a preliminary injunction against the school district. Utilizing the standard of material and substantial interference, the court emphasized that the decision to discipline was made solely as a result of the principal's taking offense to the content of the site; no evidence of a disturbance was shown as a result of the site and there was no evidence of a particularized reasonable fear of

such interference. The court specifically noted that "[d]isliking or being upset by the content of a student's speech is not an acceptable justification for limiting student speech under *Tinker.*" *Beussink,* 30 F.Supp.2d at 1180.

Likewise in *Emmett v. Kent School District No. 415,* 92 F.Supp.2d 1088 (W.D.Wash.2000), a high school senior posted a web page from his home computer that contained mock obituaries of two of the student's friends. The obituaries were written tongue-in-cheek and were inspired, in part, by a creative writing class held the previous year in which students were assigned to write their own obituaries. The web site became a topic of discussion at the school by both faculty and students and viewers of the site were allowed to vote on whom would "die" next. When the site was characterized on the local television news as featuring a "hit list," the student was immediately placed on emergency expulsion. Subsequently, the expulsion was modified to a five-day suspension.

In granting a temporary restraining order in favor of the student, the federal district court interpreted *Fraser* narrowly, finding that the speech was "not at a school assembly," and applied *Tinker* without discussion as to the political nature of the speech in that case. The court concluded that the speech was "outside of the school's supervision or control." *Emmett,* 92 F.Supp.2d at 1090. Further, and perhaps blending a true threat analysis with that of the *Tinker* construct, the court found that there was no evidence that the student intended to threaten anyone, that the site did threaten anyone, or that the speech manifested any violent tendencies.

Finally, in *Killion v. Franklin Regional School District,* 136 F.Supp.2d 446 (W.D.Pa.2001) the district court, in a well-crafted opinion, granted summary judgment in favor of a student who was suspended for the creation of a "Top Ten" list about the school's athletic director. The list included statements regarding the director's physical appearance and his genitalia. The student who created the list emailed the list to friends at their homes, yet the list subsequently found its way onto school grounds. In addressing the student's First Amendment argument, the district court determined that the

*Tinker* standard was the appropriate one by which to evaluate the student's speech, regardless of whether the speech was regarded as on-or-off campus expression.

Applying this standard, the court found that the school failed to satisfy *Tinker's* requirement of actual or foreseeable substantial disruption. In reaching its conclusion, the court specifically took note of the circumstances of the case, as well as the failure of the school to adduce any evidence of actual disruption in the classroom or that teachers were incapable of teaching or controlling their classes. Of particular relevance to this appeal, the court opined that the speech "was not threatening, and, although upsetting to [the director], did not cause any faculty member to take a leave of absence, [as in *J.S.*]" *Killion,* 136 F.Supp.2d at 455.

However, other courts, which have grappled with factual scenarios that do not specifically involve the Internet and that do not square with either *Tinker* or *Fraser,* have used differing approaches. Some courts have utilized *Tinker* and have focused upon whether the communication resulted in a substantial disruption of the school environment. *See Saxe v. State College Area School District,* 240 F.3d 200, 216 (3d Cir.2001)(reading *Fraser* and *Kuhlmeier* as narrow exceptions to *Tinker*); *Pyle v. South Hadley School Committee,* 861 F.Supp. 157 (D.Mass.1994). Other courts have only focused on *Fraser. Boroff v. Van Wert City Board of Education,* 220 F.3d 465 (6th Cir.2000). Yet, other courts have applied both *Tinker* and *Fraser* to particular facts. *Denno v. School Board of Volusia County, Florida,* 218 F.3d 1267 (11th Cir.2000)(*Tinker* does not apply to the exclusion of *Fraser*); *Chandler v. McMinnville School District,* 978 F.2d 524 (9th Cir.1992)(applying facts to all three student expression cases).

The United States Supreme Court has not spoken in any case involving facts that are analogous to this case. Although other lower courts, in the context of Internet communication, have focused on *Tinker,* based upon our prior discussion, we are not convinced that reliance solely on *Tinker* is appropriate. Yet, whether the facts before us are more aligned with the events in *Fraser* and governed by the lewd and plainly offen-

sive speech analysis, or are more akin to the situation in *Tinker* and thus subject to review for substantial disruption of the work of the school, we need not definitively decide, for application of either case results in a determination in favor of the School District. Thus, we will first apply *Fraser*, and then *Tinker* to the facts *sub judice*.

Application of the analysis used in *Fraser* to the facts before us is relatively straightforward. The punishment for the use of lewd, vulgar and plainly offensive language, including the personal attacks on Mrs. Fulmer and Principal Kartsotis, fits easily within *Fraser's* upholding of discipline for speech that undermines the basic function of a public school. The statements made in the "Teacher Sux" web site are no less lewd, vulgar or plainly offensive than the speech expressed at the school assembly and held subject to discipline in *Fraser*. Thus, were we to solely apply *Fraser*, we would have little difficulty in upholding the School District's discipline.[13]

However, as noted above, questions exist as to the applicability of *Fraser* to the instant factual scenario. Yet, it becomes apparent to this court that it is the unique needs of the school setting and concern for the school's education mission that was the foundation not only of *Fraser*, but *Tinker* as well. Even considering the importance of political speech and recognizing a student's constitutional right to free speech in the school setting, the Court in *Tinker* evinced its basic belief that disruption of the work of the school, i.e., the educational process, would have rendered the speech punishable. Indeed, the Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to

13. We caution that it is for school districts to determine what is vulgar, lewd or plainly offensive, at least in the first instance. Great deference should be given to their determination, as courts must not become embroiled in micromanaging school officials' administration of the institution's daily affairs. "[O]n the question of when the pungency of sexual foolery becomes unacceptable, the school board ... is in the best position to weigh the strengths and vulnerabilities of the town's 785 students. The First Amendment does not compel the court into this arena." *Pyle*, 861 F.Supp. at 170.

prescribe and control conduct in the schools." *Tinker*, 393 U.S. at 507, 89 S.Ct. 733. Daily administration of public education is for school officials, *id. Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), and with that responsibility, officials possess the inherent authority to prescribe and control conduct in the public schools. *Id.* Thus, consistent with the authority of school officials to bring order to the school environment, and the limitations on speech therein as set forth in *Tinker*, it is the issue of disruption, potential or actual, that dissemination of "Teacher Sux" caused to the work of the school that must finally be reviewed.

 While J.S. and his parents contend that the disruption was minimal and does not satisfy the mandate of *Tinker*, we disagree. Keeping in mind the unique nature of the school setting and the student's diminished rights therein, while there must be more than some mild distraction or curiosity created by the speech, *Burnside*, 363 F.2d at 748, complete chaos is not required for a school district to punish student speech. *See Boucher*, 134 F.3d at 827 (diagnostic tests of school computer system by computer experts some evidence of past disruption that would support forecast of future disruption); *Karp*, 477 F.2d at 174–75 (assembly cancelled and walkout of classes by some students); *Killion*, 136 F.Supp.2d at 455 (no evidence of threatening speech or faculty member taking leave); *Bystrom*, 686 F.Supp. at 1392 (substantial disruption established by students reading unofficial newspaper in classroom); *Baker*, 307 F.Supp. at 522 (disruption to class room study and student's failure of attention due to reading of unofficial newspaper meets requirements of *Tinker*).

We find that the School District has adduced sufficient evidence that the communication contained in the "Teacher Sux" web site caused actual and substantial disruption of the work of the school.[14]

14. We reject the argument offered by J.S. and his parents, that it was the viewing of the web site by the faculty and the students on their own that served as the genesis of the disruption. According to J.S. and his parents, it was not J.S.'s importation of the contents of the web site

The web site posted by J.S. in this case disrupted the entire school community—teachers, students and parents. The most significant disruption caused by the posting of the web site to the school environment was direct and indirect impact of the emotional and physical injuries to Mrs. Fulmer. The direct effects of the web site on Mrs. Fulmer's physical and mental health are noted above. Aside from the immediate effects of the site on Mrs. Fulmer, Mrs. Fulmer was unable to complete the school year and took a medical leave of absence for the next year. Mrs. Fulmer's absence for over twenty days at the end of the school year necessitated the use of three substitute teachers that unquestionably disrupted the delivery of instruction to the students and adversely impacted the education environment.[15]

Students were also adversely impacted. Certain students expressed anxiety about the web site and for their safety. Some students visited counselors. The web site was a "hot" topic of conversation even prior to faculty discovery. Finally, among the staff and students, there was a feeling of helplessness and low morale. The atmosphere of the entire school community was described as that as if a student had died.

Finally, the disruption also involved parents. Certain parents understandably voiced concerns for school safety and questioned the delivery of instruction by substitute teachers.

In sum, the web site created disorder and significantly and adversely impacted the delivery of instruction. Indeed, it was

onto the school campus that caused the disruption; rather it was the faculty, after viewing the site, which caused any disorder. We find that it was J.S. that accessed his web site at school, told other students about the site and was the source of the disruption. The site was not aimed at a random audience but at the specific audience of students and others in the School District. Thus, it was inevitable that the site would pass from students to teachers and have an impact upon the school environment. The web site was directly aimed at disrupting the school environment and did so in concrete fashion.

15. While the statements regarding Mrs. Spaights did not serve as the foundation for the charges brought against J.S., see footnote two above, we note that Mrs. Spaights was also unable to complete the school year and a substitute teacher was required to finish the instruction in her class.

specifically aimed at this particular school district and seemed designed to create precisely this sort of upheaval. Based upon these facts, we are satisfied that the School District has demonstrated that J.S.'s web site created an actual and substantial interference with the work of the school to a magnitude that satisfies the requirements of *Tinker*. Thus, for the reasons stated above, we find that the School District's disciplinary action taken against J.S. did not violate his First Amendment right to freedom of speech.

The order of the Commonwealth Court is affirmed.

Former Chief Justice FLAHERTY did not participate in the decision of this case.

Chief Justice ZAPPALA files a concurring opinion in which Justice NIGRO joins.

Justice CASTILLE joins the majority opinion and files a concurring opinion.

Chief Justice ZAPPALA, concurring.

I agree with the majority that the disciplinary action taken by Bethlehem Area School District against J.S. did not violate his first amendment right to freedom of speech. I therefore join the majority in affirming the order of the Commonwealth Court. I write separately, however, to note my disagreement with several issues addressed by the majority.

Because the United States Supreme Court has given little guidance since rendering its decision in *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), in terms of a standard to determine what constitutes a "true threat," I join the majority in relying on *Lovell By and Through Lovell v. Poway Unified School District*, 90 F.3d 367 (9th Cir.1996), and *In the Interest of A.S.*, 243 Wis.2d 173, 626 N.W.2d 712 (2001), for supplying a standard to adjudge whether certain speech falls within the definition of "true threat," that is, "if the communication is a serious expression of intent to inflict harm." Majority op. at 858. I cannot, however, agree with the majority that the statements made by J.S. on

the web site at issue fail to satisfy this standard. In my opinion, in light of the totality of the circumstances here, the statements at issue (as summarized in the majority opinion at pp. 851–52 and 858) constitute threatening statements which connote a serious expression of intent to inflict harm and are therefore beyond first amendment protection. As such, the statements provided an ample basis for Bethlehem Area School District to determine that J.S. violated school district policy by committing the Level III infraction of "threat to a teacher."

The majority goes on to conclude that although the statements made by J.S. on the web site at issue did not constitute a "true threat," the web site did create "an actual and substantial interference with the work of the school to a magnitude that satisfies the requirements of *Tinker [v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)]." Majority op. at 869. I agree with the majority's application of *Tinker* and the majority's ultimate conclusion. However, in the course of reaching this conclusion the majority "hold[s] that where speech that is aimed at a specific school and/or its personnel is brought onto the school campus *or accessed at school by its originator*, the speech will be considered on-campus speech." Majority op. at 865 (emphasis added). I believe this holding is overly broad and unnecessary to the resolution of this case.

As the majority aptly points out, J.S. "facilitated the on-campus nature of the speech by accessing the web site on a school computer in a classroom, showing the site to another student, and by informing other students at school of the existence of the web site." *Id.* at 865. In my view, these factors alone support the characterization of the speech as on-campus speech. However, the fact that a web site is merely *accessed at school by its originator* is an insufficient basis upon which to base a characterization of the speech as on-campus speech.

Accordingly, I concur in the result.

Justice NIGRO joins this concurring opinion.

Justice CASTILLE, concurring.

I join the majority opinion. I think the question of whether the communications at issue amounted to a "true threat" is a close one, and one that reasonable jurists might disagree about. In light of the totality of the circumstances, including the targeted, violent and solicitous statements here concerning one particular teacher, there is something to be said for Mr. Chief Justice Zappala's conclusion that the communications "constituted threatening statements which connote a serious expression of intent to inflict harm" which are entirely beyond First Amendment protection. This question, however, is an intensely factual one and, after much reflection, I am satisfied to join in Mr. Justice Cappy's view of the matter. I do so because Justice Cappy's analysis of this important question, as well as the question of whether the School District could otherwise punish J.S. for the communications—including Justice Cappy's exposition of the constitutional standards and considerations that must govern our review—is analytically comprehensive and legally convincing. I also join in the majority opinion because I believe that it is important for this Court to decide cases by clear majority opinion whenever possible, and particularly where, as here, the case is heard upon discretionary appeal. *See U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, —— – ——, 122 S.Ct. 1516, 1526–27, 152 L.Ed.2d 589 (2002) (O'Connor, J., concurring).